JOSEPH ANGSTADT, BY WARREN C. ANGSTADT, HIS FATHER
AND NEXT FRIEND, APPELLEE, V. RALPH COLEMAN,
APPELLANT.
58 N. W. 2d 507

Filed May 8, 1953.   No. 33254.

*Pilcher & Haney*, for appellant.

*Mecham, Stoehr, Moore, Mecham & Hills*, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiff Joseph Angstadt, a minor, by Warren C. Angstadt, his father and next friend, brought this action in the district court for Douglas County to recover damages for personal injuries sustained by him due to the negligence of the defendant Ralph Coleman in driving his automobile in such a manner as to collide with the motor scooter driven by the plaintiff. The case was tried to a jury resulting in a verdict for the plaintiff. Judgment was entered thereon. Defendant's motion for judgment notwithstanding the verdict, or in the alternative for a new trial, was overruled. The defendant appeals.

The plaintiff's petition alleged that he was a minor 16 years of age; that about 8:45 p. m., May 13, 1950, he was driving his motor scooter west on L Street in the city of Omaha; that after completing a left turn to enter a filling station on the south side of L Street a short distance east of Forty-second Street, the defendant, who was approaching from the west in his automobile, collided with the motor scooter; and that in so doing the defendant was guilty of negligence in the following respects: (1) that he failed to keep a proper lookout; (2) that he failed to heed a red traffic signal at the intersection; (3) that he failed to slow down or stop his automobile and thus avoid the collision; and (4) that he was negligent in failing to observe the plaintiff in a position of danger and to use ordinary care in such situation to avoid the accident. The petition further set forth certain ordinances of the city of Omaha as to restrictions on speed as the same applied to the vicinity and place where the accident occurred. The petition further set forth the injuries sustained by the plain-

tiff; alleged the medical and hospital expenses; and prayed judgment for damages.

The defendant's answer admitted the minority of the plaintiff and the occurrence of the accident; denied generally the allegations of negligence charged to the defendant; and affirmatively alleged that the contributory negligence of the plaintiff was more than slight and was the direct and proximate cause of the accident, and sufficient to bar recovery. The reply was a general denial.

It was stipulated that the district where the accident occurred would be considered a residential district. The speed limit was 35 miles an hour.

L Street is a through highway running east and west. It is 54 feet wide where the accident occurred and provides passing, driving, and parking lanes for east and west-bound traffic. On the southeast corner of the intersection of Forty-second and L Streets is the Peers Filling Station, east of it is the Village Bar, and east of the bar is the West L Variety Store. It is 40 feet from the east curb line of Forty-second Street to the west edge of the driveway into the filling station. The filling station driveway is 47 feet wide. On each corner of the intersection of Forty-second and L Streets are traffic signals. These signals consist of a green light which indicates to proceed through the intersection, a yellow light, referred to by some witnesses as amber, to indicate caution, and a red light to indicate a stop and not to proceed through the intersection until the traffic light turns green. While there is conflict in the evidence as to whether the lights in the filling station were on or off, there is no question but that the intersection and the place where the accident occurred were well lighted.

There is much dispute in the record as to the color of the defendant's automobile. Suffice it is to say that it was a 1941 Ford V-8 four-door sedan and, it being admitted that the defendant's automobile was involved in the accident, reference to its color will be omitted.

When we refer to the intersection in the opinion, it

is the intersection of Forty-second and L Streets in the city of Omaha.

While most of the witnesses testified to the position of the defendant's car and the plaintiff's motor scooter and where the plaintiff was lying immediately after the accident, we will not set forth this testimony except that of the detective sergeant who made the official investigation.

We refer to the parties as designated in the district court.

The plaintiff testified that at the time the accident occurred he was 16 years old and a junior in South High School. On the evening of May 13, 1950, he was driving his motor scooter west on L Street at a speed of from 10 to 15 miles an hour in the driving lane for west-bound traffic. As he approached the Variety Store he turned into the passing lane, looked back over his left shoulder, and gave a signal for a left turn into Peers Filling Station. He noticed a car behind him. He looked to the west for oncoming traffic. The view to the west was clear, and the traffic lights at the intersection were amber. When he was even with the driveway of the filling station the traffic lights at the intersection turned red. He noticed two cars right at, or near, the traffic lights. He believed they would stop. One car came through the red traffic light signal. This was the defendant's car. He endeavored to avoid being struck by this car but was unable to do so. It collided with his motor scooter, striking it directly on the side. At that time he was about in the middle of the driveway, in the driving lane of east-bound traffic. The next thing he knew he was waking up at St. Catherine's Hospital.

Sergeant Manna was driving his automobile east on L Street at about 35 to 40 miles an hour. When in the block west of the intersection and within 100 feet of the traffic lights, the lights turned amber. He started to slow down, and when he was within 55 to 60 feet

of the intersection the traffic lights turned red. He was in the right-hand lane. He noticed a car pull up to his left, in the left-hand lane of traffic, at an estimated rate of speed of 50 miles an hour. After passing his car, this car proceeded into the right-hand lane of traffic, through the red light. He watched it, and right after it ran through the red light he heard a crash east of Forty-second Street.

Richard Knight (Knipe) was in the front seat with Sergeant Manna. He testified that when they were about 90 feet from the intersection the traffic light was amber. When they were about 50 feet from the intersection a car passed to their left. After it passed, the traffic light turned red and this car proceeded through the intersection on the red light. He heard a crash east of the intersection.

Alma Ruth Short was riding with her brother, Master Sergeant Mullins, in his car traveling west on L Street in the driving lane. Upon approaching the intersection she saw a motor scooter traveling west. It was east of the Variety Store in the driving lane which is the north lane of west-bound traffic. They passed the scooter, and she looked back through the back window and saw the driver of the scooter give a left-turn signal into the filling station. At that time they were making a right turn to go north on Forty-second Street. She saw a car come through the intersection from the west, going east. The traffic lights for east and west-bound traffic were amber. Immediately after turning north she noticed the traffic light at the intersection turn red. She heard a noise, but did not see the impact between the car and the motor scooter. Her brother stopped the car and they went to the scene of the accident.

Sergeant Mullins testified that he was driving his car west on L Street. Between Forty-first and Forty-second Streets he saw a motor scooter in the west-bound traffic lane traveling at a speed of about 15 miles an hour. He passed the scooter in that block. The traffic

lights at the intersection were green. As he approached close to the intersection they turned amber. He made a right turn at that time. As he did so he noticed a car approaching the intersection from the west going east at a rate of speed of from 45 to 50 miles an hour. He did not see the traffic light turn red. He heard a crash behind him and went to the scene of the accident. He endeavored to thin out the crowd so that his wife, a registered nurse, could administer to the injured boy, the plaintiff. He notified the boy's parents, having been handed the boy's drivers license by his wife.

Sherry Mullins testified that she was riding with her husband, Sergeant Mullins, and her sister-in-law, and was in the back seat of the car. She recalled passing the motor scooter, and afterwards she looked back and noticed the driver of the motor scooter give a signal for a left turn. As they approached the intersection, the traffic lights turned yellow. As they turned north on Forty-second Street she saw a car coming from the west. When they had completed the turn she looked out the back window and saw this car go through the intersection on a red light. She heard a crash but did not see the impact, but did see sparks, like metal striking metal. She went to the scene of the accident, administered to the plaintiff, and accompanied him to the Douglas County Hospital in an ambulance. He was in a semicomatose condition.

Robert Byers testified that he was sitting on some steps on the northwest corner of the intersection. He saw a motor scooter about a block east of him coming west on L Street with its lights on. He believed it was going to turn into the filling station. At that time the lights at the intersection turned yellow. Shortly thereafter he noticed traffic from the west going east. He saw the defendant's car when it was 50 to 60 feet west of the intersection. His attention was attracted to a car going north. After looking at that car, he heard a crash and saw the defendant's car and the motor scooter

collide. This was the same car he saw approaching on the yellow light. It struck the scooter on the side and the boy "went flying." He estimated the speed of the defendant's car to be 40 to 50 miles an hour and the speed of the motor scooter about 10 miles an hour. Defendant's car stopped on the east side of the driveway into the filling station.

The defendant Ralph Coleman testified that he was driving his 1941 Ford which was in good mechanical condition and had good tires and brakes. He had his lights on low beam. On the evening in question he was driving in his east-bound driving lane at 35 miles an hour, and when about half a block from the intersection of Forty-second and L Streets, the traffic lights were green. As he approached the intersection he lifted his foot from the gas lever. He went through the intersection in the driving lane and did not change his position. When he went into and through the intersection the traffic light was still green. His windshield was clean. He noticed two cars proceeding west about half a block east of the intersection, and there was a car parked in front of the Variety Store. He was 30 to 35 feet east of the intersection going directly east when he first saw the scooter 15 feet in front of him going in a southwesterly direction. There was no light on the front of the scooter, and it did not slow down. He was driving 30 to 35 miles an hour, and he jammed on his brakes. When the two vehicles came together he was going 5 miles an hour. The scooter struck his car at an angle, spun around, and was thrown back in the direction from which it came on its own momentum. The boy was still on it, and when about 30 feet distant he fell to the south and the scooter skidded in the same direction. The front part of the scooter, or the fork, struck the defendant's car a little bit left of center on the left side. The left end of the bumper of his car was torn off and the right end was flattened. The hood was pushed to the right, and the grille on the right side was pushed to the right. He

did not stop at Forty-second and L Streets. He did not sound his horn, and did not swerve his car to the left or right. The scooter was well within the area of his headlights, and was just entering the driving lane. The street lights on the southeast corner of the intersection were on.

Louis Bystrom testified that he was riding with John Groth in the right-front seat of Groth's car. They were proceeding west on L Street in the driving lane about 20 miles an hour. When they got to Forty-first Street there was a motor scooter about 50 feet in front of them near the edge of the lane going west. Half a block east of Forty-second Street the scooter turned into the passing lane. Groth's car was about 25 feet behind the scooter at that time. When the scooter was just about to the Variety Store, the driver turned his head and looked to the left and made a left turn. Groth's car passed him at that time. Bystrom further testified that he saw the defendant's car right in the intersection or close to it, and the traffic light was green. Likewise, the car in which this witness was riding went through the intersection on a green light. He further testified that the boy on the scooter did not look in front of him at oncoming traffic as he was making the turn. He was positive that the traffic light was green when the defendant's car went through the intersection proceeding east. He did not notice whether the boy on the scooter signaled a left turn, nor how fast the defendant was driving.

John Groth testified that he was driving his 1939 Dodge, proceeding west on L Street. He first noticed the scooter between Forty-first and Forty-second Streets. It was about a quarter of a block ahead of him and three-quarters of a block east of Forty-second Street. He was driving 20 to 25 miles an hour with his lights on, and was in his own right-hand driving lane. He did not notice whether the lights on the scooter were on or not. He continued west, and noticed the scooter start to turn,

about the middle of the block. It was going about the same speed that he was driving, and was 35 to 40 feet in front of him. The driver of the scooter was making a gradual turn to the left. He did not notice whether a signal for a left turn was given or not. The traffic lights at the intersection of Forty-second and L Streets were green. He heard the crash, but did not see the impact. He was 45 or 50 feet from the intersection at that time, and the traffic lights were still green. He crossed the intersection when the traffic lights were green. He parked his car and went to the scene of the accident.

Detective Sergeant Gates testified that he arrived at the scene of the accident to make an investigation at about 8:57 p. m. He noticed a light colored 1941 Ford car sitting in the east-bound driving lane on L Street, that is, the south lane of traffic on L Street, facing the east. It was at the driveway of the filling station which is located on the southeast corner of Forty-second and L Streets. It was sitting with the rear wheels approximately even with the west entrance, or west curb break, of the driveway of the filling station. A young man was lying a little distance from the 1941 Ford. He was 46 feet from the point of impact, 20 feet 6 inches from the south curb of L Street, and 7 feet 4 inches from the center line of L Street. He would be approximately on a line between the two east-bound lanes of traffic, the driving lane and the passing lane, possibly a little more in the passing lane. The scooter was 72 feet 6 inches from the determined point of impact, east and north of the point of impact on the north side of L Street. There were skid marks which led from the front wheels of the Ford to a point 31 feet 9 inches west of where the Ford stopped. The west end of the skid marks were 28 feet 3 inches east of the extension of the curb line of Forty-second Street, in the east-bound driving lane. The front end of the Ford was east of the east curb line of Forty-second Street about 60 feet. The Ford traveled 5 feet from the point of

impact. There was debris in front of the Ford. The light on the front of the scooter was broken, as was one light on the defendant's car.

A witness engaged in the traffic and safety engineering business testified that the average reaction time of a driver in applying brakes to stop a car when confronted with a dangerous condition is five-eighths of a second; that at 35 miles an hour a car travels 53 feet a second; that at the reaction time of five-eighths of a second, a car traveling at 35 miles an hour would travel approximately 32 feet before any brakes could be applied; and that the driver of a car traveling 35 miles an hour seeing a motor scooter some 12 to 14 feet ahead of his car (and there is evidence to the effect that the defendant saw the motor scooter that distance ahead of his car) and attempting to apply his brakes before the accident would go 15 feet beyond the object before he had a chance to apply his brakes.

Dr. James Ryder testified that he first saw the plaintiff May 13, 1950, at the Douglas County Hospital. The patient was unconscious and delirious, not able to answer questions, screaming, and almost uncontrollable. He was either in the second or third degree of unconsciousness. His condition was serious and dangerous. He began to respond from his condition when he was transferred to St. Catherine's Hospital on May 18, 1950. His condition remained serious up to June 6, 1950, when other treatment was accorded him for his severe injuries. He was hospitalized for 32 days.

Dr. Frank Iwersen, a specialist in orthopedic surgery, examined the plaintiff on May 13, 1950, at Douglas County Hospital. He detailed the injuries received by the plaintiff and testified that he had a serious brain injury at that time.

We deem it unnecessary to set out all the injuries and the examinations made by the doctors with respect thereto as the extent of the injuries received by the plain-

tiff and the medical and hospital expenses are not questioned, except as appears in the opinion.

The defendant contends that the trial court erred in overruling his motion for judgment notwithstanding the verdict, or in the alternative for a new trial. The following rule of law becomes pertinent in considering this assignment of error: "A motion for directed verdict or its equivalent must, for purpose of decision thereon, be treated as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be deduced from the evidence." Davis v. Spindler, *ante* p. 276, 56 N. W. 2d 107. See, also, Bank of Keystone v. Kayton, 155 Neb. 79, 50 N. W. 2d 511.

In support of this assignment of error the defendant argues that the accident occurred about 8:30 p. m., May 13, 1950; that on January 5, 1951, approximately 8 months thereafter, the plaintiff's deposition was taken; and that in his deposition he testified that prior to the accident he did not see the defendant's car, had no recollection of it, and did not remember any of the events with reference to the accident. At the time of trial he was able to recall the events as to what happened prior to and at the time of the accident.

The testimony of plaintiff's attending physician and Dr. Iwersen is of assistance on this phase of the case. We summarize that part that is applicable. When Dr. Ryder examined the plaintiff immediately after the accident he was in a second or third degree of unconsciousness, was unable to respond or to answer questions, was hysterical and excitable, was suffering from traumatic shock, and had a serious brain injury of such a type that there is sometimes loss of memory as to events immediately prior to the accident, which condition is usual and possible, and it would take several months for his memory to return so that he would be able to recollect all

events that occurred prior to and at the time of the accident. Dr. Iwersen testified that he had general knowledge as to traumatic amnesia from brain injury; that loss of memory is a frequent occurrence; and that some months thereafter the patient may regain memory. The defendant does not refute this testimony. He merely states that there was no testimony to the effect of loss of memory on the part of the plaintiff, and that the hospital records refute such a condition.

The defendant relies on the cases of Gohlinghorst v. Ruess, 146 Neb. 470, 20 N. W. 2d 381, Peterson v. Omaha & C. B. St. Ry. Co., 134 Neb. 322, 278 N. W. 561, and Rahfeldt v. Swanson, 155 Neb. 482, 52 N. W. 2d 261.

There is a distinction between the cited cases and the case at bar. The case of Kipf v. Bitner, 150 Neb. 155, 33 N. W. 2d 518, distinguishes the cited cases, and this distinction applies to the instant case. In that case the court said, in substance, that the cases cited were cases where the plaintiff pleaded and testified to one story in one or more actions or trials, and after obtaining a benefit therefrom, or imposing a detriment thereby, it was found that they could not thus substantiate their claim, in which event they materially and substantially changed their testimony or pleadings and testimony in another trial, manifestly with a fraudulent motive for the purpose of obviating objections pointed out by the court in a former trial, or to meet the exigencies of their case, and, by thus experimenting and toying with litigants in courts, they vainly sought to obtain a recovery. The cases relied upon by the defendant were all in the final analysis grounded upon elements of estoppel. The case at bar contains none of such elements which could make plaintiff's testimony, given in his deposition, conclusive upon him or discredit, as a matter of law, all his testimony given at the trial. Rather, plaintiff's testimony, about which defendant complained, must be classified in the field of admissions. In the law of evidence, admissions are concessions or voluntary acknowledgments

made by a party of the existence of certain facts, and they are designated generally as extrajudicial or quasi admissions, and judicial or true admissions.

The deposition was not used by the plaintiff for his own purposes or benefit to the detriment of the defendant. It was not inconsistent with or contrary to any allegation of the plaintiff's petition. It was taken by the defendant for his own purposes and benefit, and rightly used by him as such on cross-examination, simply to contradict and impeach the plaintiff's present claim and his other evidence given at the trial.

Next, in considering this assignment of error, the defendant contends that the evidence discloses contributory negligence on the part of the plaintiff which was more than slight, and sufficient to bar recovery in this case.

The defendant relies on Petersen v. Schneider, 153 Neb. 815, 46 N. W. 2d 355, as follows: "We think the correct rule to be applied in cases of this kind is: Where the driver of a vehicle turning across a street or highway between intersections fails to look at all at a time and place where to look would be effective, or looks and negligently fails to see that which is plainly in sight, or is in a position where he cannot see, a question for the court is usually presented. Where he looks but does not see an approaching automobile because of unusual conditions or circumstances, or sees the approaching vehicle and erroneously misjudges its speed or distance, or for some reason assumes he could safely complete the movement, the question is usually one for the jury."

The defendant also cites Whitaker v. Keogh, 144 Neb. 790, 14 N. W. 2d 596, and Dale v. Omaha & C. B. St. Ry. Co., 154 Neb. 434, 48 N. W. 2d 380, as also governing, to the effect that when the operator of a vehicle turning across the street between intersections sees an approaching car and tests an obvious danger by moving from a place of safety into the path of the oncoming vehicle and is struck, he is guilty of contributory negligence

sufficient to bar a recovery as a matter of law.

It appears from the evidence that this is not a case where the plaintiff left a position of safety and attempted to test obvious danger. Rather, it is a case where he had reason to believe, by relying on the red traffic light at the intersection, he could make the left turn in safety and that the defendant would obey the traffic signal. It is true that when the defendant came through the red traffic light and was straight ahead of the plaintiff, the plaintiff was in a position of danger and endeavored to avoid the accident and injuries sustained by him.

A person traveling a favored street protected by a stop sign, of which he has knowledge, may properly assume that oncoming traffic will obey it. See, Riekes v. Schantz, 144 Neb. 150, 12 N. W. 2d 766. The same is true with reference to a traffic signal. See, Dale v. Omaha & C. B. St. Ry. Co., *supra*.

"A user of the highways may assume, unless and until he has warning, notice, or knowledge to the contrary, that other users of the highways will use them in a lawful manner, and until he has such warning, notice, or knowledge, he is entitled to govern his actions in accord with such assumption." Plumb v. Burnham, 151 Neb. 129, 36 N. W. 2d 612.

We conclude that the trial court did not err in overruling the defendant's motion for judgment notwithstanding the verdict, or in the alternative a motion for new trial.

The defendant contends that the trial court in its instructions informed the jury that it might take into consideration whether or not the defendant sounded his horn, and by so doing committed prejudicial error for the reason that the plaintiff's pleadings did not contain such element of negligence and the same did not attach to the defendant under the circumstances of this case. The plaintiff's petition was sufficient in that it did state in effect that the defendant failed to sound a warning.

There was also evidence that the defendant failed to sound his horn, and if he had sounded it the plaintiff would have heard it. While it is questionable under the evidence what effect the sounding of the defendant's horn would have had with reference to the accident, we believe that the trial court did not commit prejudicial error as contended for by the defendant.

The defendant contends that the trial court erred in refusing to submit to the jury his requested instructions Nos. 2 and 5, as follows: Instruction No. 2. "If you find that plaintiff turned to the left between intersections into the path of defendant's automobile and did not look for defendant's automobile, or if you find that plaintiff looked and failed to see defendant's automobile, and that in either case, defendant's automobile was plainly in sight, then plaintiff is not entitled to recover in this action and your verdict should be for the defendant."

Instruction No. 5. "The driver of a vehicle who makes a left turn between intersections on a public street is required to keep a constant look out for other vehicles approaching from the opposite direction."

In support of this contention the defendant relies upon the cases of Kristufek v. Rapp, 154 Neb. 343, 47 N. W. 2d 923, Trumbley v. Moore, 151 Neb. 780, 39 N. W. 2d 613, and Ficke v. Gibson, 153 Neb. 478, 45 N. W. 2d 436. The cited cases relate to a pedestrian crossing between intersections, and impose upon a pedestrian in doing so the following, as set forth in Trumbley v. Moore, *supra*: "A pedestrian crossing a street at a place other than a street intersection or crosswalk in direct violation of a city ordinance is required to keep a constant lookout for his own safety in all directions of anticipated danger."

And, as stated in Ficke v. Gibson, *supra*: "One who attempts to cross a street between intersections without looking is guilty of such negligence as will bar a recovery as a matter of law. If he testifies that he did look, it is implied that he looked in such a manner that

he would see that which was in plain sight, unless some reasonable excuse for not seeing is shown."

The case at bar is distinguishable from the cited cases in that it involves a left turn made by a vehicle between intersections into a driveway. In this connection, the trial court in instruction No. 11 instructed the jury that it was not a violation of a city ordinance or the statutes to make a left turn between intersections, nor was it negligence as a matter of law to do so. Then the instruction set forth the manner in which the driver of the vehicle should make the left turn, the care that should be used in doing so, and that making a left turn between intersections is an unusual occurrence and the driver must do so in the exercise of ordinary care for his own safety. We need not set out the entire instruction, except to say that it followed the law as stated in Dickman v. Hackney, 149 Neb. 367, 31 N. W. 2d 232, which involved a situation where a driver of a vehicle, in the nighttime, made a left turn into her driveway without giving the proper signal to indicate that fact. This court said that while she admittedly violated the statute, a violation of the statutes regulating the use and operation of motor vehicles upon the highways is not negligence per se, but is evidence of negligence which may be taken into consideration with all the other facts and circumstances in determining whether or not negligence is established thereby. See, also, Landrum v. Roddy, 143 Neb. 934, 12 N. W. 2d 82, 149 A. L. R. 1041; Gleason v. Baack, 137 Neb. 272, 289 N. W. 349; Armer v. Omaha & C. B. St. Ry. Co., 151 Neb. 431, 37 N. W. 2d 607.

We make reference to instruction No. 13 given by the trial court, upon which the defendant predicates error, in that he contends it assumed a fact which was in dispute, that being that the plaintiff, in his deposition testified that he did not see the defendant's automobile prior to, or at the time of, the accident, and later testified as we have set out the facts with reference to

seeing the defendant's automobile. From an examination of this instruction, the court stated: "If you find from a preponderance of the evidence, the burden of which is upon the plaintiff to establish, that when he looked to the west before he entered the eastbound lanes of L Street * * *," then it made reference to the signal lights. It will be observed that the trial court did not say specifically that the plaintiff looked to the west. He said that this must be shown by a preponderance of the evidence, and must be established. The instruction is pertinent further for the reason that it required the plaintiff, in the exercise of ordinary care, as explained in other instructions, to look and observe, so that if an automobile came toward him he could reasonably place himself in a position to escape, and that matter was for the jury to determine.

Making reference to the defendant's requested instruction No. 2, and without reviewing the evidence, it is apparent that the cases cited by the defendant in support thereof are inapplicable, and also that the instruction is tantamount to instructing a verdict for the defendant.

In addition, the following rule is applicable: "An instruction which sets out a state of facts, and authorizes a verdict for one of the parties upon a finding of such facts, is erroneous, unless it includes every fact necessary to sustain a verdict in favor of such party, unless the omitted facts are conclusively established." Sanders v. Chicago, B. & Q. R. R. Co., 138 Neb. 67, 292 N. W. 35. See, also, In re Estate of House, 145 Neb. 670, 17 N. W. 2d 883.

We conclude this assignment of error is without merit.

The defendant predicates error upon the trial court giving instruction No. 12. This instruction has to do with the condition of the lights at the time the defendant came through the intersection, that is, whether the traffic light was red or green, and thereafter, the ordinary care that he should use in so doing, and then placed

a certain burden upon the plaintiff in signaling his intention to turn to the left, and that the headlight on his motor scooter was lighted. There is no prejudicial error in this instruction, and the defendant's contention in such respect is without merit.

The rule is: "Where the instructions as a whole clearly present to the jury the issues of fact and the law applicable thereto, harmless error in instructions separately criticized on appeal do not require a reversal of the judgment on the verdict." Interstate Airlines, Inc. v. Arnold, 127 Neb. 665, 256 N. W. 513.

The issues of fact and the law applicable thereto were clearly submitted by the entire charge and the jury was permitted to find for the plaintiff on the evidence adduced.

For reasons given in this opinion, the judgment entered on the verdict by the trial court is affirmed.

AFFIRMED.