RAY PEAKE, APPELLEE, v. OMAHA COLD STORAGE COMPANY, A CORPORATION, APPELLANT.

64 N. W. 2d 470

Filed May 21, 1954.   No. 33451.

Smith & Smith and Pilcher & Haney, for appellant.

Wear & Boland, W. O. Baldwin, and John E. North, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought by Ray Peake, as plaintiff, in the district court for Douglas County, against the defendant, Omaha Cold Storage Company, a corporation, to recover property damage resulting from a collision between a truck owned by the plaintiff and a truck owned by the defendant. The defendant denied any negligence on its part, and filed a counterclaim alleging negligence on the part of the driver of the plain-

tiff's truck which caused the collision and property damage to the defendant. The case was tried to a jury resulting in a verdict in favor of the plaintiff. Motion for judgment notwithstanding the verdict and for a new trial filed by the defendant was overruled. The defendant appeals.

The pleadings of the respective parties, insofar as necessary to consider in this appeal, are in substance as follows: The plaintiff's petition alleges that the damages occasioned to the plaintiff were the direct and proximate result of the negligence of the defendant corporation acting through its employee Winfield S. Boaz in the following particulars, as summarized in the trial court's instructions: (1) In the defendant's driver failing to accord to the plaintiff's transport the right-of-way; (2) in the defendant's driver failing to keep a proper lookout for traffic upon the highway; (3) in the driver of the defendant's truck and trailer driving directly into the path of the transport owned by the plaintiff when the plaintiff's transport was in such close proximity that a collision could not be avoided; (4) in the defendant's driver failing to heed the sounding of the horn given by the driver of the plaintiff's transport; and (5) in the driver of the defendant's truck suddenly making a turn from the west, or left side of the highway to the right side thereof without giving a proper and legal signal.

The defendant's answer and counterclaim charged that the collision and the property damage resulting to the defendant's truck were caused solely by the negligence of John D. Newell, the driver of the plaintiff's transport, in the following particulars, as summarized in the trial court's instructions: (1) That the driver of the plaintiff's transport drove the same at a rate of speed greater than was reasonable and prudent under the conditions then existing, considering the load carried by the transport, and at a rate of speed in excess of 20 miles an hour; (2) that the driver of the plaintiff's transport

attempted to pass the tractor and trailer of the defendant on the wrong side thereof; (3) that the driver of the plaintiff's transport drove the same more closely to the tractor and trailer of the defendant than was reasonable and prudent under the circumstances; (4) that the driver of the plaintiff's transport failed to accord the right-of-way to the defendant's tractor and trailer; (5) that the driver of the plaintiff's transport failed to stop the same in time to avoid striking the trailer and tractor of the defendant; and (6) that the driver of the plaintiff's transport failed to keep a proper lookout for vehicles traveling upon the highway.

At the time of the accident, the plaintiff was engaged in the business, as sole owner, of transporting gasoline, kerosene, and tractor fuel. He owned a 1948 International tractor and gasoline-tank trailer approximately 28 feet long, composed of four compartments which would contain 5,100 gallons. The trailer was pulled by a tractor, the overall length of the tractor and trailer being from 33 to 36 feet in length and approximately 8 feet in width at the widest point. The unit was loaded at the time of the accident and weighed 51,600 pounds.

The defendant's unit was an International tractor with a semi-trailer attached, of an overall length of 43½ to 44 feet, its greatest width being 8 feet. Its weight was approximately 9,500 pounds. This trailer carried a trade name of "Ocoma." It was loaded with 50 pounds of cargo at the time of the accident, and was driven by Winfield S. Boaz, an employee of the defendant, who was killed in the collision.

For convenience we will refer to Ray Peake as plaintiff, and the Omaha Cold Storage Company, a corporation, as defendant, as the same are designated in the district court; to the plaintiff's International tractor and trailer as the Peake truck; to the driver of the same, John D. Newell, as Newell; to the defendant's International truck and semi-trailer as the Ocoma truck; and to its driver, Winfield S. Boaz, as Boaz.

The collision occurred about noon on July 20, 1951, on a highway a short distance north of an intersection where Madison Avenue intersects State Highway No. 31 in Elkhorn, Nebraska. Highway No. 31 runs north and south, has a concrete surface, and is 20 feet in width at the point of collision. Madison Avenue, which intersects Highway No. 31 on the west side thereof, consists of black-top paving and is 20 feet in width. Where it enters Highway No. 31 it spreads out, or expands, to a width of 63 feet. There is also involved in this collision a graveled road which intersects Highway No. 31 on the east, and which is north of where Madison Avenue intersects Highway No. 31. This road is 14 feet wide and runs east of the highway a distance of 15 feet and then makes a sharp curve to the south to the property of the defendant located under and just east of the viaduct. This graveled road is about 105 feet north of the center point of Madison Avenue, and it is 60 feet from where the north edge of Madison Avenue meets the highway to where the south edge of the graveled road meets the highway. The collision occurred approximately at the point where the graveled road enters Highway No. 31 from the east, within the limits of the village of Elkhorn where the speed is fixed by ordinance at 20 miles an hour. There is a stop sign approximately 25 feet west of where Madison Avenue intersects Highway No. 31 to require traffic proceeding east on Madison Avenue to stop before entering the intersection. There is also a graveled road extending to the northeast of Madison Avenue and entering Highway No. 31 which is protected by a stop sign. Highway No. 31 is also protected by a stop sign on the graveled road intersecting it from the east heretofore mentioned. On the east side of Highway No. 31 is a house occupied by one Daily, and a tree which will be designated as where the vehicles laid immediately after the collision.

The viaduct, or overpass, consists of an earthen elevation of the highway on the north and south sides of the

railroad tracks which run generally in an east-west direction. The highway coming from the south slopes artificially upward toward a point adjacent to and 25 feet above the level of the railroad tracks; and the highway coming from the north does likewise. These two points in the roadbed, which have been artificially elevated by earthen structures, are joined together by a steel and concrete bridge that spans the railroad tracks and the valley wherein they lie. Highway No. 31 is 24 feet wide on the bridge portion of the viaduct but narrows as it goes down the earthen incline on the north so that from a point 53 feet from the north end of the bridge portion of the viaduct up to and beyond the point of collision the highway is 20 feet in width. There are guardrails on the east and west sides of the viaduct.

The record shows that the Peake truck was loaded at McPherson, Kansas, on July 19, 1951, with gasoline and other oil products. It was driven to Chester, Nebraska, where the plaintiff Peake is engaged in the transportation of such products. At about 6 a. m., July 20, 1951, Newell, an employee of Peake, proceeded to drive the truck to Omaha to deliver the cargo. He entered Highway No. 31, and proceeded north thereon to the village of Elkhorn at a rate of speed of 35 miles an hour until he came to the viaduct just south of the point of impact. As he approached the viaduct there were speed signs limiting the speed to 25 miles an hour. In compliance therewith, he reduced his speed to between 20 and 25 miles an hour and proceeded to cross the viaduct with his vehicle on the east, or right side of Highway No. 31. His vision was unobscured. The day was clear and the pavement dry. There were no vehicles ahead of him as he proceeded north over the viaduct starting down toward the scene of the accident.

Newell further testified that when he first saw the Ocoma truck its front wheels were just starting onto the west edge of Highway No. 31. It had been proceeding

east on Madison Avenue which ends at the west side of Highway No. 31. The Ocoma truck proceeded in a northeasterly direction on the west, or left side of Highway No. 31, at a rate of speed of 10 to 15 miles an hour. The front end of the Peake truck was 35 or 40 feet from the Ocoma truck. Newell blew the horn of the Peake truck. The Ocoma truck proceeded out into Highway No. 31, swung part way across the highway with one wheel across the middle line of the highway, then swung back to the left or west side of the highway, proceeded a short distance, and then swung sharply to the east or right. Newell removed his foot from the accelerator and applied his brakes, at just what moment he did not remember. He did not see the driver of the Ocoma truck give a signal to indicate a turn to the right, or east. He had watched the Ocoma truck at all times. Newell turned the front wheels of the Peake truck to the right and started off to the east but was unable to miss hitting the Ocoma truck. The left front part of the tractor of the Peake truck struck the right side of the tractor of the Ocoma truck. At that time the Peake truck was headed northeast. The left front wheel was 2 to 2½ feet west of the east edge of the concrete at the time of the impact. The vehicles came together at the east edge of the highway. The Peake truck was then traveling at a rate of speed of 15, 16, or 17 miles an hour. Newell testified that he was not passing the Ocoma truck. It was in front of him at all times, and kept in front of him until the time of the impact. At the time the Ocoma truck turned to the right, the Peake truck was practically upon it. Newell remembered nothing further about the accident.

On cross-examination, Newell testified that when he first saw the Ocoma truck he was 20 to 25 feet south of the north end of the viaduct. At that point he could see down to the place where the accident happened, which was an estimated distance of 85 to 90 feet.

The Ocoma truck tractor was disengaged from the

trailer during the collision. The trailer remained on the left or west lane of the highway headed north after the collision, while the tractor rolled over in a north-easterly direction down an embankment on the east side of the highway and came to rest against a tree located about 63 feet northeast of the point of impact. The Peake truck came to rest in an upright position headed northeast down the embankment with the tractor portion of the unit against and upon the Ocoma tractor.

A trooper of the Nebraska Safety Patrol testified that he received a call at 12:04 p. m., and proceeded to the scene of the accident. He observed the Peake truck in the ditch on the east side of Highway No. 31, with the tractor of the Peake truck on top of the tractor of the Ocoma truck which was upside down in the ditch. The trailer of the Ocoma truck was sitting on the left, or west lane of Highway No. 31. The Ocoma truck was up against the third tree north of the intersecting road on the east side of the highway, 80 to 85 feet north and east of the center of the graveled road that leads to the east and south to the defendant's mills. From the stop sign on the east side of Highway No. 31 to the back end of the Peake truck was 22 feet. The tractor of this truck was headed in a northeast direction. The distance from the front end of the Ocoma trailer to the back end of the Peake trailer was 12 feet, that would be the right front corner of the Ocoma truck to the left and rear corner of the Peake truck. From an examination of the highway, there were no skid marks of any kind, and there was no showing of black marks made by the Peake truck, or evidence of the brakes having been applied. There did appear to be a mark the size of a billfold, which indicated it was a tire mark, 18 inches west of the east side of the pavement on Highway No. 31 adjacent to the end of the guardrail.

A safety engineer testified that the reaction time of an average motor vehicle driver is three-fourths of a second, while that of a professional driver is five-eighths

of a second. He further testified that a vehicle moving 25 miles an hour would move 37½ feet a second, and a vehicle moving 20 miles an hour would move 30 feet a second. In the event you considered the reaction time of five-eighths of a second, it would mean five-eighths of 30 feet, which would be in the neighborhood of 16, 17, or 18 feet for a vehicle moving 20 miles an hour, which indicates that, moving down the highway at 20 miles an hour and moving your foot from the accelerator to the brake pedal on a basis of five-eighths of a second reaction time, the vehicle would move 18 feet by the time you completed the movement. He further testified that in the course traveled by the Peake truck there was a slope of about 5 feet in approximately 400 feet, slightly under one percent grade. The reaction distance at 25 miles an hour would be about 22½ feet. The stopping distance would be 63.8 feet. In other words, from the time the driver gets an impulse or sees a danger and decides to stop his vehicle at 25 miles an hour, he can stop that vehicle, including the reaction time, in a distance of 63.8 feet.

A witness, by deposition, testified that he was proceeding east on Madison Avenue on a motorcycle and saw the Ocoma truck, the trailer of which was on the west side of Highway No. 31, headed north. The trailer was standing still. He saw a lot of dust, but did not see the impact. He was 50 yards from the Ocoma truck when he first saw it. He saw the trailer of the Peake truck, but there was so much dust that he could not see the tractor. He thought it was at a standstill. He went to the scene of the accident and, in this connection, corroborated the position of the vehicles as testified to by other witnesses.

An employee of the defendant testified that he was coming out of the door of the mill office which is located east of and below the viaduct on Highway No 31; that it was a distance of 25 to 30 feet from where the mill stands to the floor of the viaduct; and that the office

door was 10 or 15 feet east of the viaduct, facing straight north. He was going to lunch when he saw the Ocoma truck right over the top of the viaduct, facing north and proceeding north. He watched this truck for a little while then turned to eat his lunch, assuming that the driver of the truck, whom he knew, was coming to the mill. At that time it was 5 or 10 minutes before noon. There is evidence on the part of the plaintiff to the effect that it would be impossible to see the defendant's truck from the point where this witness testified that he could see it on the viaduct.

There is testimony of two boys to the effect that they were walking on Madison Avenue at about noon up the hill to the highway; that at the top of the hill there is a street which runs south to the village of Elkhorn; and that they noticed Paul Tyson on a motorcycle as he went by them. There was no other vehicle on Madison Avenue and no truck went by them while they were walking up Madison Avenue toward the top of the hill. They saw just the motorcycle. They heard the crash, but did not see the accident. Another boy testified that he lived on the street about a block west of Highway No. 31, in a house facing onto the railroad tracks which run east and west. At about noon he was riding his bicycle in front of his house. The street which runs in front of his house is about even with the north end of the viaduct, and from that point he could see the viaduct. He saw the Ocoma truck going north on the viaduct and it continued going in that direction. He did not know that an accident had happened. This testimony is to the effect that the Ocoma truck did not enter the highway from Madison Avenue, but crossed the viaduct on the highway traveling north, the viaduct being south of Madison Avenue.

The defendant contends that the trial court erred in overruling the defendant's motion for directed verdict, in overruling the defendant's motion for directed verdict on its counterclaim, and in overruling the defendant's

motion for judgment notwithstanding the verdict.

A motion for directed verdict or its equivalent, or for judgment notwithstanding the verdict, must be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed, and such party is entitled to have every controverted fact resolved in his favor and have the benefit of every inference that can reasonably be deduced from the evidence. See Paxton v. Nichols, 157 Neb. 152, 59 N. W. 2d 184.

The defendant makes reference to the position of the Peake truck and the Ocoma truck and the evidence with reference to the speed of the trucks as heretofore recited. In addition, that Newell, in his deposition before trial, computed his distance from the defendant's unit as 15 or 20 feet from the north end of the viaduct while at the trial he computed his distance from the defendant's unit at 35 to 40 feet. Also, in Newell's deposition he estimated his speed at the time of the collision at 10 miles an hour while at the trial he estimated it from 15 to 17 miles an hour. The defendant asserts that the evidence discloses that it is 150 feet from where Newell said he was when he first saw the defendant's unit to the point of collision. The computation is made as follows: It is 111 feet from 12 feet north of the south line of Madison Avenue to the point of collision, and adding the 35 or 40 feet as testified to by Newell that he was south of defendant's unit when he first saw it, he would proceed an approximate 150 feet to the point of collision. Therefore, considering the testimony that Newell slackened his speed, that he did not remember when he applied his brakes, and that he could have stopped the truck in 63.8 feet, in failing to do so he was negligent as a matter of law. We believe there is evidence by which the jury could determine that the driver of the defendant's truck was negligent in driving north on the west or left side of Highway No. 31 and turning, without signaling, across the path of the Peake truck which was

only a few feet distant and moving at a rate of speed of 15 to 17 miles an hour and signaling his position of peril by blowing the horn.

"No person shall turn a vehicle from the direct course upon a highway unless such movement can be made with reasonable safety, and then only * * * after giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement." § 39-7,115, R. R. S. 1943. Violation of such statute constitutes evidence of negligence. See, Petersen v. Schneider, 153 Neb. 815, 46 N. W. 2d 355; Dickman v. Hackney, 149 Neb. 367, 31 N. W. 2d 232.

We conclude that there was sufficient testimony to warrant the submission of plaintiff's case to the jury.

With reference to the testimony referred to by defendant in the deposition of Newell, and his testimony at the time of trial being different, the following is applicable: "An extrajudicial admission appearing in the deposition of a party taken before trial is not ordinarily final and conclusive upon him, but it may be competent and admissible as evidence in contradiction and impeachment of his present claim and his other evidence given at the trial, to be given such weight as the trier of fact deems it entitled." Illian v. McManaman, 156 Neb. 12, 54 N. W. 2d 244.

The defendant contends that the trial court erred in submitting the issue of negligence on the part of the driver of the defendant's truck in failing to stop at the stop sign on Madison Avenue when there is no evidence that the driver of the defendant's truck failed to stop at such stop sign. In this connection, the trial court submitted to the jury certain instructions relating to the statutes of this state and ordinances of the village of Elkhorn setting forth the duty of a driver of a motor vehicle in crossing a state highway on which a stop sign is located, the speed that drivers using highways and streets are permitted to drive, and the care to be used commensurate with the circumstances relating to traf-

fic, speed, and conditions; and that the violation of such statutes or ordinances is not in itself negligence as a matter of law but shall be considered together with all other facts and circumstances in evidence in determining whether the one so violating the same was negligent.

In addition, the trial court submitted to the jury the duty of a driver of a motor vehicle about to enter a highway protected by stop signs. This instruction was in keeping with the decisions of this court on the subject. Then, in the same instruction, the trial court stated: "On the other hand, where the driver of a car approaches a highway protected by stop signs stops, looks and sees an approaching vehicle on the highway but erroneously judges its speed or distance and assumes that he can proceed with safety, whether or not he is negligent in proceeding depends upon what in the exercise of ordinary care a reasonably prudent man would determine about the distance, speed and safety in proceeding."

In addition, the trial court instructed the jury to the effect that the defendant presented evidence for the purpose of establishing that the defendant's unit was driving over the viaduct and proceeding northward intending to make a right turn onto the road leading to the mill, and then stated that if the jury found these facts to be true and that a preponderance of the evidence disclosed that the defendant's unit did not come from Madison Avenue, then the statutes and ordinances relative to the stop sign on Madison Avenue and the duty of the driver of the defendant's truck and the plaintiff's driver relative to such intersection need not be considered. In the same instruction the court stated that if, on the other hand, a preponderance of the evidence established that the defendant's driver came out of Madison Avenue and the jury found he was negligent in doing so, such negligence would not be the proximate cause of the accident. His later acts should be considered, where and how he drove and how and where the plaintiff's unit was driven after the defendant's driver had made the turn

into Highway No. 31, the speed of the vehicles, and their position at such times, and all other facts and circumstances in evidence in order to determine the proximate cause of the collision.

The trial court in instruction No. 1 set forth the elements of negligence charged to the driver of the defendant's truck which are set forth previously in the opinion and need not be repeated, and in instruction No. 5, the trial court instructed the jury that the burden of proof was on the plaintiff to prove by a preponderance of the evidence any one of the acts of negligence charged.

The trial court did not submit the issue of negligence on the part of the driver of the defendant's truck in failing to stop at the stop sign. The instructions with reference to the duty of the driver of a motor vehicle to stop at stop signs was given for the reason that there is evidence that the defendant's driver approached Highway No. 31 from the west on Madison Avenue. We conclude there was no prejudicial error on the part of the trial court in giving these instructions.

Instructions are to be considered together, to the end that they may be properly understood, and, if as a whole they fairly state the law applicable to the evidence when so construed, error cannot be predicated on the giving thereof. See, Danner v. Walters, 154 Neb. 506, 48 N. W. 2d 635; Gallagher v. Law, 135 Neb. 381, 281 N. W. 806; Angstadt v. Coleman, 156 Neb. 850, 58 N. W. 2d 507.

The defendant contends the trial court erred in refusing to permit the witness Merle Daily to give an estimate of the speed of the Peake truck just prior to the time of the collision. The defendant attempted to lay a foundation for the admission of this testimony by showing that the witness had driven vehicles for a number of years and had paid attention to speedometers; that he lived adjacent to the scene of the collision; that immediately before the collision he was in his yard 60 or 70 feet south of his house, about the same distance

east of the highway, and about 100 to 300 feet from the Peake truck when he first saw it; that he was walking north; and that the blast of the horn of the Peake truck caused him to look over his shoulder and see the front end of the Peake truck at the north edge of the viaduct. He testified that he paid no particular attention to the movement of Peake's truck. He did not have the speed of the truck in mind, and at most gave it merely a glance.

"Ordinarily where it appears from the evidence of a witness that, although he saw the car in movement immediately before the accident, but he had no reasonable length of time, movement in distance, or other means to use as a basis upon which to formulate an opinion as to the speed thereof, he should not be allowed to testify in regard thereto." Haight v. Nelson, 157 Neb. 341, 59 N. W. 2d 576.

It is true, the strict enforcement of this rule has been modified to some extent. See, Koutsky v. Grabowski, 150 Neb. 508, 34 N. W. 2d 893; Kraft v. Wert, 150 Neb. 719, 35 N. W. 2d 786, which cases are clearly distinguishable from the case at bar. In the instant case it is apparent that the witness had no basis for estimating the speed of the Peake truck just prior to the time of the collision. The trial court did not err as contended for by the defendant.

The defendant contends that the trial court erred in assuming that there was evidence of imminent danger confronting Newell and instructing the jury on the sudden emergency rule. The evidence heretofore recited is sufficient to warrant the submission of such an instruction. See, Belik v. Warsocki, 126 Neb. 560, 253 N. W. 689; Riekes v. Schantz, 144 Neb. 150, 12 N. W. 2d 766. We find no error in the trial court giving such instruction.

The defendant contends the trial court erred in failing to instruct the jury on the doctrine of the last clear chance. In this connection the following authority is

applicable: A litigant injured in an accident who has placed himself in a position of peril is not entitled to an instruction under the last clear chance doctrine where it appears that he had the means at hand up to the time of the accident to have avoided injury. Such a situation involves questions of negligence and contributory negligence and not the last clear chance doctrine. See, Pope v. Tapelt, 155 Neb. 10, 50 N. W. 2d 352; Kubo v. Fish, 152 Neb. 74, 40 N. W. 2d 270; Carter v. Zdan, 151 Neb. 185, 36 N. W. 2d 781. The issues of negligence and contributory negligence were properly submitted to the jury. There is no merit to the defendant's contention.

The defendant contends the trial court erred in failing to instruct the jury that there was no evidence that the driver of the defendant's truck failed to stop at the stop sign as required by law, and the following authority is applicable: "Where there is no eyewitness, no direct evidence of the accident causing the injury, the facts and circumstances may be proved by circumstantial evidence, and the presumption is raised by the instinct of self-preservation on behalf of the deceased that he was not guilty of contributory negligence, but was in the exercise of due care and caution for his own safety, unless the contrary is shown." Engel v. Chicago, B. & Q. R. R. Co., 111 Neb. 21, 195 N. W. 523. The presumption also applies to charges of negligence as well as contributory negligence. See Schroeder v. Sharp, 153 Neb. 73, 43 N. W. 2d 572.

We have heretofore set forth a considerable part of the evidence which contains both direct and circumstantial evidence by which a jury could determine whether or not the driver of the defendant's truck did or did not stop at the stop sign and whether he was negligent in such respect. The following authority is applicable: "The presumption of due care arising out of the natural instinct of self-preservation is not evidence, but a mere rule of law, and obtains only in the absence of direct or circumstantial evidence justifying

reasonable inferences one way or another upon the subject; when such evidence is produced the presumption disappears and is not entitled to be considered." O'Dell v. Goodsell, 152 Neb. 290, 41 N. W. 2d 123. We conclude that the defendant's contention cannot be sustained.

The defendant contends that the trial court erred in not permitting the wife and daughter of the driver of the defendant's truck to testify to his general, normal, and usual habits, that is, to stop at stop signs and comply with the law in such respect.

In Annotation, 15 A. L. R. 138, it is stated: "Although the cases are not in accord, and decisions from the same state do not always apply a uniform general rule, the numerical weight of authority is to the effect that, if a person is killed in an accident of which there are no eyewitnesses, evidence of his habits is admissible as tending to throw light upon his probable conduct at the time of the injury."

Defendant also cites Noonan v. Maus, 197 Ill. App. 103, as follows: "While the general rule is that where there are eyewitnesses to an accident, testimony as to the habits of the person injured is not admissible for the purpose of proving due care on his part, yet where eyewitnesses are lacking to some part of an accident, it is proper to admit evidence of the careful habits of the party injured for his own safety and of his skill and experience in driving." See, also, Tyrrell v. Boston & Maine Railroad, 77 N. H. 320, 91 A. 179. Other cases are cited from foreign jurisdictions to the same effect, and reference is also made to Engel v. Chicago, B. & Q. R. R. Co., *supra*; Schroeder v. Sharp, *supra*; Cotten v. Stolley, 124 Neb. 855, 248 N. W. 384; 5 Am. Jur., Automobiles, § 618, p. 845; and Holberg v. McDonald, 137 Neb. 405, 289 N. W. 542.

However, the authorities agree that if there are witnesses to an accident in which a person is killed, evidence of his habits is not admissible to show either care or

negligence on his part. See, Annotation, 15 A. L. R. 135; 5 Am. Jur., Automobiles, § 618, p. 845.

The issue of the negligence of the driver of the defendant's truck in failing to stop at the stop sign was eliminated by the trial court from the charges of negligence pleaded by the plaintiff against the driver of the defendant's truck, therefore, the habit of the driver of the defendant's truck of stopping at a stop sign on previous occasions is not material to any issue submitted to the jury and in considering the necessary inferences to be drawn from Newell's testimony, it does relate to the conduct of the driver of the defendant's truck at the stop sign. Newell testified that he did see the driver of the defendant's truck entering the highway from Madison Avenue on which the stop sign was located. We conclude that the rejection of the testimony of these two witnesses did not constitute prejudicial error.

The defendant contends the trial court erred in not permitting the jury to visit the scene of the collision upon the request of the defendant during the progress of the trial and at the conclusion of the trial when the request was renewed and joined in by the plaintiff.

The jury had the benefit of the evidence, numerous exhibits consisting of maps and pictures which pointed out the location of all the places, objects, and distances involved in this case. The refusal of the trial court to permit the jury to view the premises involved in the litigation is not reversible error in the absence of an abuse of discretion. Whelan v. City of Plattsmouth, 87 Neb. 824, 128 N. W. 520; Large v. Johnson, 124 Neb. 821, 248 N. W. 400. We conclude that the trial court did not err as contended by the defendant.

Other assignments of error are without merit and need not be discussed.

For the reasons given herein, the verdict of the jury and the judgment entered thereon are affirmed.

AFFIRMED.