A. L. CHASE, ADMINISTRATOR, APPELLEE, v. CHICAGO, BURLINGTON & QUINCY RAILWAY COMPANY, APPELLANT.

FILED MARCH 26, 1912. No. 16,622.

1. **Master and Servant**: INJURY TO SERVANT: DEFECTIVE APPLIANCES: DUTY OF MASTER. Where a boy, between the age of 17 and 18, inexperienced in railroad work, was employed at night as a hostler helper, and a part of his duty was, when the engines were taken to the coal chutes, to go upon the top of the tender, to call

9

up to the man in charge of the chute, whose station was above, and ask from which bin the coal was to be taken, to indicate to the person moving the engine where to stop, to lower the apron in order to deliver the coal, to distribute it in the tender, and to raise the apron thus closing the chute, all being done by the light of a lantern, and it appeared that the track was defective so that the engine and the structure of the coal chute were in dangerous proximity, and that iron bolts projected from the side of the posts supporting the structure, *held* that it was the duty of his employer to warn him of the peculiar dangers connected with the coaling of engines at that place.

2. ———: ———: ———. An employee is entitled to assume that his employer has used due care to provide reasonably safe appliances for the doing of his work. Knowledge of the increased hazard from the negligent construction or location of a structure in dangerous proximity to a defective railway track will not be imputed to a boy between 17 and 18 years of age who had been employed for about three weeks, doing his work at night by the light of a lantern, merely because he was aware of the general surrounding conditions.

3. ———: ———: ———: ASSUMPTION OF RISKS: QUESTIONS FOR JURY. Unless from the undisputed facts a court can declare, as a matter of law, that the employee actually had or was chargeable with knowledge of the dangerous condition of the place where he worked or the defective condition of the structures and appliances in connection therewith, so that he assumed the risk, those questions should be submitted to the jury. *Tobler v. Union Stock Yards Co.*, 85 Neb. 413.

4. ———: ———: TRIAL: INSTRUCTIONS. It is not erroneous to instruct a jury, in substance, that the natural instinct and disposition of men to avoid personal harm may, in the absence of evidence, raise the presumption that a person injured or killed was at the time in the exercise of ordinary care, and that it should, in determining this question, consider all the evidence and the circumstances proved.

5. ———: ———: NEGLIGENCE OF MASTER: EVIDENCE. Evidence examined, and *held* to establish the negligence of defendant in respect to the construction, maintenance and manner of operating a coal chute and the track adjacent thereto.

APPEAL from the district court for Saunders county: GEORGE F. CORCORAN, JUDGE. *Affirmed.*

*James E. Kelby* and *Frank E. Bishop,* for appellant.

*W. B. Comstock* and *G. W. Simpson, contra.*

LETTON, J.

Burton A. Nunn was killed as the result of an accident occurring at the coal chute of defendant in the Lincoln yards on February 14, 1907. The plaintiff is the administrator of his estate. This action was brought to recover damages for the death of Nunn, based upon the alleged negligence of defendant in the construction and maintenance of its coal chute and the track adjoining the same. Plaintiff recovered a judgment, from which defendant has appealed.

The deceased was a young man between 17 and 18 years of age. He had worked for the defendant as helper for a night hostler named Young for three weeks, and had never worked in the yard or about the coal chute in the day time. In addition to other duties usually performed by a hostler helper, it was the duty of Nunn when the engines were taken to the coal chutes to go upon the top of the tender, to call up to the man in charge of the chute, whose station was above, and ask from which bin the coal was to be taken, to indicate to the person moving the engine where to stop, to lower the apron in order to deliver the coal, to distribute it in the tender, and to raise the apron thus closing the chute. On the night of the accident two locomotives coupled together, which had been used as a "doubleheader," had just come in from being used upon a train. The engines were headed south. The north engine was out of repair or "dead," and the two were operated by the south engine. The hostler, Young, with two helpers, Nunn and Eitel, went upon the north engine, and another hostler, Freeland, and his helper went upon the south engine. Nunn entered the engine at the gangway, or open space between the fire-box and the tender. Young began to adjust the air valve on

the engine, when Freeland on the other and live engine started to back both engines to the north on the west side of the coal chute. The engines moved only a few feet when Freeland abruptly stopped. He testifies he could give no reason for so doing. The moment the engines stopped, Young, who was on the side of the cab farthest from the chute, heard the sound of breaking glass on the side of the cab next to the chute. A moment before Nunn was seen standing by him directly in front of the opening to the coal box from the gangway. When Young heard the glass break he stepped to the side of the engine next to the chute, and there discovered Nunn hanging by the collar of his coat on the projecting end of a stay-rod extending through a post on the west side of the chute at a point about 3 or 4 feet south of the south end of the cab, his head partially crushed. He was unable to speak and died next morning.

The petition alleges that Nunn was, on account of his age and inexperience, wholly unacquainted with the dangers and hazards of the employment. It is further charged that the posts of the coal chute were carelessly and negligently constructed too close to the railway track; that defendant had carelessly and negligently allowed the track adjoining the chute to become out of repair and to sag on the side next to the chute so far as to cause engines and tenders in passing along the track to lean towards and strike against the chute; that about 8 or 10 feet above the ground the end of a large iron bolt projected towards the railroad track a distance of about 3 inches horizontally; and that by reason of defendant's negligence in maintaining the posts with the bolts therein so close to the railway track, in maintaining the railway track so close to the post, in permitting it to become defective and to settle and sag next to the posts, and in failing to warn and instruct Nunn and to furnish proper and safe appliances, Nunn was caught and crushed, from the effects of which he died. The defense is a general denial, and pleas of assumption of risk and contributory negligence.

The coal chute was originally constructed about 20 years ago when smaller engines were generally employed in the service. It stood upon a stone foundation about $2\frac{1}{2}$ or 3 feet high, upon the top of which were timbers about 15 feet long, supporting bins in which coal was stored; the space underneath the bins being open. These timbers were tied or fastened together with iron rods extending from side to side and fastened with washers and nuts on the outside of the posts. The particular rod or bolt upon which Nunn was suspended projected about $2\frac{1}{2}$ or 3 inches from the post, a portion of which extension, however, was taken up by the washer and nut. The testimony is conflicting as to the height of the projecting bolt with reference to the engine. The witness Slye, who was working for the defendant at the time but who was at the time of the trial not in its service, testified that it was a dark and cloudy night at the time of the accident, that he was working about 120 feet away from the place, that he helped to take Nunn down, and that the projecting bolt would be below the eaves of the cab somewhere between 6 or 8 inches, and would be 3 or 4 feet above the head of a person of Nunn's size if he was standing in the gangway. The testimony on this point on behalf of the defendant is that the bolt was below the sill of the cab window; one of the witnesses testifying that it was 8 inches below the bottom of the window. This is practically the only point upon which there is a serious conflict in the testimony. It appears that the overflow from a water-tank nearby, used to furnish water for the engines, had run down near and about this track, and that on this account the rail on the side next to the coal chute had settled in such a manner as to incline the engines towards the chute, thus leaving a very small space between the large engines and the posts. There is no dispute, but that the rail next to the chute was irregular and uneven both vertically and horizontally, and that it had settled so that large engines came very near the posts; and there is some testimony that they sometimes rubbed the same near the south end of the

chute. It was also shown that the supporting timbers of the coal chute at the point where the accident happened bulged towards the track. A moment before the accident, Nunn was standing in the gangway behind the other helper who was working with the fire-box. There were no footboards on the side of the engine. There is no testimony as to his movements after he left the position where he was last seen before the accident, or the exact position in which he was when he was caught by the projecting bolt and crushed between the engine and the chute. If the testimony of plaintiff's witnesses with respect to the height of the bolt is to be believed, he must have been standing upon the tender where it was his duty to be when the engine stopped and he was caught by the projection, and there is sufficient testimony to sustain the verdict of the jury upon this point if they believed the witnesses for the plaintiff. On the other hand, if the testimony of defendant's witnesses as to the height of the bolt is taken as true, Nunn must have been caught as he stood in the gangway looking up to the coal bins so as to notify the person operating the engines where to stop. He had the right to be in either place. He could not have been in the cab, since the window was evidently broken by the crushing of his body between the cab and the post as the engine was backed.

The defendant contends that no negligence is alleged or proved which was the cause of the injury, that the danger of the place was manifest during Nunn's service, that he assumed the risk, and that the injury was the result of his own negligence. We are compelled to take another view. No person saw Nunn fall or saw him caught by the projecting rod; but, taking all the circumstances into consideration, it is evident that the negligence of defendant in permitting the track to sag so as to tilt the moving engines towards the chute, in permitting the posts of the coal chute to bulge towards the track, and the rods fastened thereto to project far enough to catch and hold the clothing of the deceased while he was on the engine,

must have been the cause of the accident. The accident occurred in the month of February. The deceased went to work at or after 6 o'clock in the evening. He was furnished a lantern to work by; there seems to have been no fixed light near. There is no evidence that he had ever been warned or notified in regard to these dangerous projections; in fact, the evidence justifies the conclusion that he had never been so warned. We are further of the opinion that it was the duty of the defendant to warn and instruct this boy of the peculiar dangers surrounding his employment at the south end of the coal chute, where the combination of sagging track, bulging posts, and projecting rods, when considered in connection with the fact that he was inexperienced and his work was to be performed at night by lantern light, formed a particularly dangerous combination. Neither are we of the opinion that, under the facts in this case, he assumed the dangers of such a situation, nor that the accident was the result of negligence on his part.

We think the facts in this case are distinguishable from those in *Chicago, B. & Q. R. Co. v. McGinnis*, 49 Neb. 649, cited by defendant, but the law laid down therein applies. As said in that case, it is only "when the risks and conditions are known to him or are apparent and obvious to persons of his experience and understanding" that an employee assumes the risk arising from an unsafe place of work. The rule is that the servant assumes the ordinary risks and dangers of the employment upon which he enters, so far as they are known and so far as they would have been known to one of his experience and capacity by the use of ordinary care. *Kotera v. American Smelting & Refining Co.*, 80 Neb. 648. In the case of *Tobler v. Union Stock Yards Co.*, 85 Neb. 413, opinion by BARNES, J., where the facts were that a watchman's shanty stood by the side of a railroad track so close thereto as to leave less than 17 inches between its projecting eaves and the ladder on the side of an ordinary box car, and a brakeman was hurt by being crushed

against the structure, the same contention was made as in this case, and some of the same cases were cited by the defendant, but the court held, following *Texas & P. R. Co. v. Swearingen*, 196 U. S. 51: "An employee is entitled to assume that his employer has used due care to provide reasonably safe appliances for the doing of his work. Knowledge of the increased hazard resulting from the negligent location of a structure in dangerous proximity to a railroad track will not be imputed to an employee, using ordinary diligence to avoid it if properly located, because he was aware of its existence and general location; and, unless from the undisputed facts the court can declare, as a matter of law, that the employee actually had or was chargeable with such knowledge and thereby assumed the risk, those questions should be submitted to the jury."

It is also contended that the verdict and judgment depend alone upon conjecture and are without foundation. The statement of facts already made is sufficient we think to answer this contention.

It is said that the court erred in giving instruction No. 7, which told the jury, in substance, that the natural instinct and disposition of men to avoid personal harm may, in the absence of evidence, raise the presumption that a person injured or killed was at the time in the exercise of ordinary care, and that it should, in determining this question, consider all the evidence and the circumstances proved. We have often said that, in the absence of direct evidence, there may be a presumption that at the time a person was injured or killed he was in the exercise of ordinary care. *Spears v. Chicago, B. & Q. R. Co.*, 43 Neb. 720; *Swift & Co. v. Holoubek*, 60 Neb. 784; *Clingan v. Dixon County*, 74 Neb. 807; *Grimm v. Omaha E. L. & P. Co.*, 79 Neb. 387, 395; *Nilson v. Chicago, B. & Q. R. Co.*, 84 Neb. 595. See, also, 16 Cyc. 1057, and note.

Complaint is made as to the giving or refusal of certain other instructions, but we find no prejudicial error in the ruling of the district court in this respect. The rights of

the defendant seem to have been carefully guarded at the
trial, and the evidence amply sustains the verdict.

The judgment of the district court is therefore

AFFIRMED.

REESE, C. J., not sitting.