EDWIN BELL, APPELLEE, v. WILLIAM H. CROOK, APPELLANT.
97 N. W. 2d 352

Filed June 19, 1959. No. 34546.

*Paul P. Chaney* and *Healey, Davies, Wilson & Barlow,* for appellant.

*C. Russell Mattson* and *Jean B. Cain,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The substance of the petition on which this cause was tried is exhibited by these statements: Appellant was on December 28, 1956, the owner of a Buick sedan automobile which was used in such a manner as to cause the owner of it to be subject to the family purpose doctrine. His son, Thomas William Crook, 18 years of age, lived in the home of his father and operated the automobile at the times important to this litigation with the permission of his father for a purpose for which it was owned by him. The son was a careless and reckless person and a careless and reckless operator of the automobile, of which appellant had knowledge, but in disregard thereof he permitted his son to have and operate it.

Appellee on that date was driving a Ford pickup truck, owned by him and his wife as joint tenants, in a proper manner southerly on a county road toward the intersection of it and an east-and-west road known as Stone Corner about 5 miles north and east of Falls City. Appellee entered the intersection. The automobile operated by Thomas William Crook traveling from the west was driven into the intersection in a careless and negligent manner and into and against the truck operated by appellee.

The north-and-south road at the place of the accident and north and south thereof was then and had been prior thereto an arterial road and was protected by stop signs erected on roads intersecting with it. Appellee and the public traveling on the north-and-south road believed that it was a favored highway protected by stop signs requiring all traffic entering it from the east and the west to stop before doing so.

The stop sign on the west of the intersection at Stone Corner was on December 28, 1956, and had been for a short time prior thereto knocked down and displaced and it was and had been in that condition without notice to or knowledge of appellee or others using the north-and-south road. It was known to Thomas William Crook before and on that date that the north-and-south road was a favored road protected by stop signs as aforesaid. He knew the stop sign on the west side of Stone Corner was displaced but he also knew that appellee and others traveling on the favored highway would assume that vehicles on the east-and-west road would stop before they or any of them would enter the intersection at Stone Corner.

The automobile operated by Thomas William Crook was not stopped before it entered the intersection and it was negligently driven against and into the truck of appellee therein. The collision of the vehicles and the injuries to and disability of appellee were caused by the negligence of Thomas William Crook which con-

sisted of his failure: To yield the right-of-way to appellee who had first entered the intersection and was then traveling on a favored highway; to stop before he entered the intersection; to maintain a speed that was reasonable and proper under the circumstances and that was not in excess of 60 miles per hour; to have his automobile under reasonable control; to keep a proper lookout for other traffic on the highway; and to exercise care and caution in approaching and entering the intersection. Appellee because of the negligence of Thomas William Crook suffered serious injuries and permanent disability. The truck of appellee was destroyed and he asked damages from appellant in a specified amount.

Appellant by answer admitted the ownership of the Buick automobile by him and that it was on December 28, 1956, at about 1:40 p. m. operated by his son upon an east-and-west road in Richardson County; admitted the ownership of the truck as stated by appellee which he was operating at that time in a southerly direction on a north-and-south road in the named county; and admitted that the vehicles were at the time approaching an intersection about 5 miles northeast of Falls City known as Stone Corner. Appellant therein asserted that the Buick automobile entered the intersection first; that appellee carelessly and negligently drove his truck upon and against the automobile of appellant; and that the negligence of appellee, detailed in the answer, was the cause of any injuries or damages he sustained because of the collision of the vehicles.

This appeal is from the order of the trial court which denied the motion of appellant for judgment notwithstanding the verdict or, in the alternative, for a new trial.

The record contains evidence tending to establish the following matters: Appellant was on December 28, 1956, the owner of the Buick automobile involved in the accident which is the occasion of this litigation.

It was owned and maintained by him for the use, benefit, convenience, and pleasure of his family. A son of appellant then lived in the family home and was 18 years of age. He was operating the automobile of his father for a family purpose for which it was owned and maintained and with the consent and knowledge of his father at the time of the accident which happened at an intersection known as Stone Corner.

The home of appellee was northeast of Barada. He was operating a Ford truck, which will be designated the truck, on a north-and-south county graveled road in a southerly direction north of its intersection with an east-and-west highway at a location known as Stone Corner about 5 miles northeast of Falls City on the afternoon of December 28, 1956. It was a clear, dry day. The intersecting highways were each 30 feet between the shoulders and each was in good condition. The territory at and surrounding the intersection known as Stone Corner was level and free of obstructions to vision. A traveler from the north or from the west had a clear view for a quarter of a mile of the road west and of the road north, respectively, of the intersection.

Appellee had traveled the north-and-south road at that location and for a distance of about 15 miles north from where it intersects with Highway No. 4 for about 17 years, during which time the north-and-south road was a through or arterial highway protected by stop signs on either side of it at the intersections of it by east-and-west roads. There was during this time a stop sign on the west side and one on the east side of the intersection known as Stone Corner. Appellee was on the day of the accident traveling south towards the intersection on a trip to White Cloud, Kansas. He had no memory from the time he was a few miles north of Stone Corner until afterwards when he was in the hospital at Falls City and a cast was being cut from his arm. He had no remembrance of approaching Stone Corner or anything about the accident. The last thing

he could recall before the collision was seeing a man who lived a few miles north of Stone Corner and at that time appellee was on the right-hand or west side of the road traveling south. He did not know and could not tell how fast he was traveling but he said that he knew he had the right-of-way. His truck was in good condition before the collision. The weight of the truck was about 4,000 pounds and the weight of the Buick car was slightly less.

Thomas William Crook, hereafter called Crook to distinguish him from his father, the appellant, and a classmate and guest of Crook were on the afternoon of December 28, 1956, at about 1:30 p. m., traveling east on the east-and-west road towards Stone Corner in the automobile of appellant, hereafter referred to as the Buick. It was operated by Crook and to his right in the front seat was his guest. The speed of the Buick on the trip until it came to a bridge west of Stone Corner was 70 or 75 miles per hour. The speed was decreased for the bridge and was not more than 55 to 60 miles per hour thereafter until it was within about a block of the intersection known as Stone Corner when the speed of it was further decreased. Either immediately before the Buick reached the bridge or just after it was crossed, the guest of Crook had been turning the dial of the Buick radio and Crook also attempted to do something concerning the operation of the radio. Crook told his guest during that trip that he had been over the road they were traveling the night before, taking home a friend of his.

When the Buick was about a quarter of a mile west of the intersection the guest saw a truck approaching from the left. It was traveling from the north towards the intersection. The truck was about the same distance from the intersection as the Buick was. The Buick decreased its speed as it neared the intersection. The truck was traveling in the middle of the road and it and the Buick reached and entered the intersection

at approximately the same time. The speed of the Buick was about the same or a little less than the speed of the truck. There is no evidence that Crook looked for traffic as he approached and entered the intersection or that he saw or knew of the truck until immediately before the collision when he swerved the Buick to the right and about that time the truck struck the Buick on its left front end and it started to turn over. Crook did not stop the Buick before he entered the intersection. The stop sign which had been installed on the west side of the intersection was at that time displaced and was in the ditch south of the road. The guest of Crook did nothing to call his attention to the truck as it was traveling towards and into the intersection.

The deputy sheriff of Richardson County learned of the accident at about 1:40 p. m., went immediately to the scene of it, and made an investigation. There were no skid marks made by either of the vehicles concerned in the accident. There was a scarred place about 1½ feet long and 2 inches deep in the intersection. It was 2 feet west and about 2 feet south of the center of the intersection. The truck after the accident came to rest 42 feet from that location at the southeast corner of the intersection, and the Buick traveled 92 feet from the scarred place in the intersection and stopped about on the south property line of the east-and-west highway east of the intersection. The vehicles were extensively damaged. The north-and-south road had a rock surface and the main-traveled portion of it was about in the center of it. The stop sign which had been installed on the west of the intersection had been mashed down and was displaced at the time of the collision of the vehicles. The deputy sheriff found no debris or marks in the intersection other than the scarred place described above.

A witness was traveling from the west and came upon the scene of the accident soon after it occurred. Ap-

pellee was lying in the road about 30 feet east of the truck. The body of Crook was south of the Buick about 10 feet in the field. Another person, referred to as the other boy, presumably the guest of Crook, was then in the ambulance. The stop sign west of the intersection was knocked down, was misplaced to the east, and was in the ditch. There were indications that a vehicle had displaced it. The witness had lived in that vicinity for 56 years and he knew that there had been stop signs at the intersection for 17 years. He estimated that the stop sign had been displaced a couple of days. He saw it shortly before the accident and he was surprised that it had been knocked down before the day of the accident. The stop sign was down 5 years previously when another accident occurred at the intersection. The stop signs at this intersection were up and down at different times. It was his recollection that the stop sign on the east of the intersection was also displaced on December 28, 1956.

A member of the county board said that during his tenure of 8 years in that position he had been acquainted with the north-and-south road and the Stone Corner intersection. The road north from Highway No. 4 had stop signs on it during that period. He was at the intersection on the Sunday before December 28, 1956. The west stop sign was down and he then put it back in place. He had erected the stop sign several times while he was a member of the county board. He estimated this was as much as five or six times each year. The sign on the Sunday before the accident appeared to him to have been pulled up but not pushed over. This was true lots of times. He never saw the west sign knocked down. It was pulled out. The one on the east appeared to have been knocked down.

A few nights before the accident Crook and three of his friends traveled the east-and-west highway from the west to the Stone Corner intersection and beyond. Crook was operating the automobile. One of the guests

desired to leave the automobile temporarily and he asked Crook to stop. The automobile had entered the intersection. It was stopped and backed off of the intersection. One of the young men was a witness and on direct examination he could not remember any conversation then had about the stop sign. He knew there was a stop sign at that intersection but he could not say he saw it that night. Later on further examination the witness admitted that he had made a statement on February 26, 1957, that there was conversation about a stop sign at the Stone Corner intersection to the effect that the stop signs were lying in the ditch and that Crook slowed as he came there but was about halfway in the intersection when someone in the automobile spoke about the stop sign. Crook stopped the automobile and backed up where he should have stopped before he entered the intersection. After that they went on east from the intersection.

Appellant lived in Falls City and was a bridge, paving, and soil conservation contractor. He operated from Kansas to North Dakota. He was assisted by his son, Thomas William Crook, when he was not in school. He worked on different crews, operated trucks, and drove his father's automobile on trips he had to make on engagements away from Falls City. These trips were more frequent than two times a week and usually at night. The son operated the automobile and his father would sleep on the trip. The son worked generally 6 days a week or a total of 60 hours but this varied depending on whether the work was interrupted by weather conditions. A fair average was 50 hours per week. During the school months the son drove his father two or three trips each month. The son operated trucks in Kansas and Nebraska but principally in Richardson County. He was well acquainted with the roads in that county. Thomas William Crook and Melvin Voegele, who was 17 years of age and lived on a farm northeast of Rulo, were close and intimate friends. They were

frequently together and went back and forth from Falls City to where Melvin Voegele lived. The trip Crook made a few nights before the accident described above, which was later identified as the Saturday before Christmas of 1956, was from Falls City to the home of Melvin Voegele. He was taken home by Crook. The east-and west road past the Stone Corner intersection was traveled in going and returning that night. It is a permissible inference that that road was frequently used by Crook in going between Falls City and the home of Melvin Voegele and returning therefrom to Falls City. Crook knew the nature of a highway stop sign and what it required. He knew the nature of an arterial highway protected by stop signs. Appellant testified he was certain that his son knew his duties and obligations when he approached a stop sign when traveling into an arterial highway.

Previous experiences of Crook were indicative of some of his practices as an operator of an automobile. He was charged in the police court with a stop sign violation of a city ordinance of Falls City on February 26, 1955, pleaded guilty, and was assessed a penalty and costs which he paid. He was charged in the same court with reckless driving of an automobile on June 6, 1955, in violation of an ordinance of the city, pleaded guilty, and was assessed a penalty and costs which he paid. He was charged in the same court with a stop sign violation on June 24, 1956, of an ordinance of the city, pleaded guilty, and was assessed a penalty and costs which were paid. When the reckless driving charge was heard appellant asked the police judge to suspend the driver's license of his son and the judge did order it suspended for 30 days. Later appellant asked the judge if he could not take the license of his son. The judge said he could not without noting the fact on the license and sending it to the state. The judge did not think the offense was sufficient to justify such action.

A pending motion of appellee recites that he has dis-

covered that a judgment has not been rendered in accordance with the verdict and he asks that the cause be by this court remanded to the district court in which the trial was had to afford him an opportunity to seek the rendition of a judgment nunc pro tunc. A case brought to this court by an appeal may not be remanded to the district court in which the trial was had for further proceedings therein while the appeal is pending and undetermined in this court. Generally there may not be simultaneous dual jurisdiction of a case.

A judgment on the verdict nunc pro tunc is not available because a judgment in the case has not been rendered. A nunc pro tunc order is to make the record speak the truth. Its function is not to supply some affirmative action of the court which should have been but was not taken. Its true purpose is to complete the record so it will exhibit action actually had but which through inadvertence or mistake was not entered in the record. Watson Bros. Transp. Co. v. Red Ball Transf. Co., 159 Neb. 448, 67 N. W. 2d 475; North Loup River P. P. & I. Dist. v. Loup River P. P. Dist., 149 Neb. 823, 32 N. W. 2d 869. The omission of the rendition and entry of a judgment was not the default of any duty of the clerk of the district court as the motion asserts. The special circumstances of this case required the trial court to order what judgment should be entered in the case. § 25-1314, R. R. S. 1943.

The right to appeal did not depend upon the rendition and entry of a judgment on the verdict. The absence of such a judgment is not significant in respect to this appeal. The order in this case denying a new trial was an appealable order. § 25-1315.02, R. R. S. 1943; Lund v. Holbrook, 153 Neb. 706, 46 N. W. 2d 130; Mueller v. Keeley, 163 Neb. 613, 80 N. W. 2d 707. The pending motion should be and is denied.

There is a page following the end of the brief of appellee entitled "ADDENDUM" for the purpose, as he says, to point out "a possible defective Bill of Ex-

ceptions herein." Appellee asks no relief in that respect. The trial of the case to and including the return, receipt, and filing of the verdict was had before Judge Ellis. He died while the motion of appellant for judgment notwithstanding the verdict or, in the alternative, for a new trial was pending. The parties thereafter stipulated that the motion should be heard and adjudicated by Judge Falloon, that he had been furnished a transcript of the evidence produced before Judge Ellis which the parties agreed was a true transcript thereof, and that the transcript of the evidence should be allowed and settled as the bill of exceptions in the case by Judge Falloon. He heard and denied the motion. The transcript of the evidence was timely served and returned in the time and manner provided by law. The parties stipulated in the transcript that it contained all the evidence offered and received and all the proceedings had before Judge Ellis and that Judge Falloon should allow and settle it as the bill of exceptions in the case, which he timely did.

The possible defect suggested is that a section of the statute provides in the case of the death of a judge "before whom the cause was tried" it should be the duty of the clerk to settle and file the bill. § 25-1140.06, R. R. S. 1943. Another section of the statute requires the bill of exceptions to be presented to and settled by "the judge who heard or tried the case." § 25-1140.05, R. R. S. 1943.

This appeal is from the adjudication made in the case after Judge Falloon had been furnished all the evidence produced and all the proceedings had before Judge Ellis in the case. It is of this adjudication that appellant complains in this court. Schields v. Horbach, 40 Neb. 103, 58 N. W. 720, considered a motion to quash a bill of exceptions on the ground, among others, that it was not signed by the judge who presided at the trial of said cause. This court said: "The first objection is not well taken. The order excluding the attorney from

appearing in the case was made by Judge Ogden, and the latter could properly settle the bill of exceptions relating to that part of the proceedings, notwithstanding he did not preside at the trial of the case upon the merits. The statute contemplates that the judge who makes the decisions, of which complaint is made, should sign the bill of exceptions * * *." Judge Falloon, under the circumstances of this case, was, within the statute, the judge who heard and tried it and he was authorized to settle the bill of exceptions.

The decision referred to by appellee, Burke Lumber & Coal Co. v. Anderson, 162 Neb. 551, 76 N. W. 2d 630, is not in point. Judge Frum tried and entered a decree in that case. He died. Judge Raun succeeded him and he settled the bill of exceptions. The opinion does not indicate that Judge Raun performed any other act or had any other connection with the case. He did not make the adjudication from which the appeal was taken. The opinion mentions that the parties did not stipulate as to the bill which was settled by Judge Raun.

An important issue in this case is whether or not there was evidence from which the jury could find that the north-and-south road was at the place of the accident an arterial or favored highway by having stop signs normally erected on the intersecting road at the Stone Corner intersection and at its other intersections even though sometimes the stop signs were displaced or were otherwise not in their normal visible position. There was evidence that for as long as 17 years the north-and-south road from Highway No. 4 for a distance of about 15 miles north had stop signs installed at the locations where it was intersected by other roads. The Stone Corner intersection was one of the places where the north-and-south road was protected by the erection of stop signs on the east and west of it. These facts were known to appellee as he traveled towards the intersection on the day of the accident and because of that he thought he had the right-of-way

over other traffic which entered and traversed the intersection. The north-and-south road had not been designated a favored highway by the county board or any public body. It had been considered and respected by the public as an arterial road. There was evidence that these facts were known to Crook before and at the time of the accident. In any event the evidence was of a character that an inference to that effect was permissible. There were quite frequent occasions when stop signs at various locations along the highway were displaced, not in their normal visible position, and temporarily remained in that condition. The stop signs at the Stone Corner intersection were known to have been displaced as many as five or six times in a yearly period. At the time of the accident, the occasion of this litigation, each of the stop signs was displaced and the west one was pulled up and was lying in the ditch along the road. Appellant asserts because of these circumstances that the north-and-south road at the location of the accident was then only an unprotected, unfavored county road. Appellee believes that it was a favored highway protected by stop signs and that its character was not changed, destroyed, or suspended because some of the stop signs were at times displaced and were not visible to travelers on the highway. Travelers using the highway had a right to assume that the stop signs along it were installed by proper authority.

In King v. Gold, 224 Iowa 890, 276 N. W. 774, it is said: "A motorist has a right to assume that highway signs having the appearance of regularity have been erected by proper authority."

Rogers v. Jefferson, 223 Iowa 718, 272 N. W. 532, contains the following: "There is no testimony in the record casting any light on the question as to who actually put these signs (a SLOW sign and a STOP sign) in their then location, but it may be fairly assumed that no one but the officers of the law in charge of the enforcement of highway regulations had anything to

do with it. In any event, we think that appellee's son was warranted in assuming that the 'SLOW' sign against which appellant was proceeding was placed there by proper authority, and that he was entitled to take it into consideration in determining his movement toward the intersection."

The court said in Trimble v. Bridges, 27 Tenn. App. 320, 180 S. W. 2d 590: "Where evidence disclosed that stop-sign had been at intersection for at least four years, in absence of any evidence to contrary, it was presumed that sign was placed there by competent officials in exercise of statutory authority * * *."

An arterial highway is not deprived of its character or status because a stop sign on an intersecting road is temporarily displaced or otherwise rendered invisible.

Connors v. Dobbs, 77 Ohio App. 247, 66 N. E. 2d 546, discusses this subject in this manner: "Plaintiff Connors, possessed of knowledge that Hawkins avenue was a main thoroughfare, had a right to rely on that knowledge and upon his preferential right to proceed uninterruptedly across its intersection with Bryden drive, until such time as, in the exercise of ordinary care, he became aware of defendant's intention not to stop before entering the intersection. Then he was required to exercise ordinary care not to injure Dobbs. * * * Dobbs, under these circumstances, was by law required to stop before entering the intersection, and his failure so to do was negligence. * * * A proper sign having been erected, Dobbs was charged with knowledge of the designation of Hawkins avenue by ordinance as a main thoroughfare, even in the then absence of a stop sign; and the evidence would warrant the inference that he had actual knowledge that Hawkins avenue, at the place of collision, was so designated, and that, even though he was approaching from plaintiff's right, he was required to come to a full stop before entering said intersection."

Titus v. Braidfoot, 226 Ala. 21, 145 So. 423, states:

"Mere temporary removal or destruction of sign indicating character of highway, designated by city ordinance as boulevard, does not change character thereof."

In Rowan v. Becker, 73 S. D. 273, 41 N. W. 2d 836, it is stated: "Under this record but little importance can be attached to the absence of one stop sign on the east side of the highway where the accident occurred. The respondent lived in the immediate vicinity of the town of Agar. He knew that Highway No. 83 was a designated arterial highway. There were at least two stop signs on the intersection to the east of the highway crossing plainly visible to travelers approaching said crossing from the east. He had ample notice that he was approaching an arterial highway."

Metzger v. Moran, 1 Wash. 2d 657, 96 P. 2d 580, declares: "When the proper authority has established an arterial highway and notified its existence to the public by the erection of a stop sign, any one approaching the arterial from an intersecting street is presumed to know that it is such and required to obey the statutory injunction to stop. He cannot be heard to say he did not know of the existence of the sign, or that he could not see it. * * * The proof offered by the appellants, which the court refused, tended to show that, after the accident, they left their car and went back to the stop sign, where they saw the parked cars. * * * The respondent, driving on the arterial street, for whose protection the stop sign was posted, had a right to assume that the law would be obeyed. If the appellants could have excused their failure to stop by showing that parked cars interfered with their seeing the sign, other drivers failing to stop could, with equal reason, urge that their view was interrupted by passing vehicles to their right. The purpose of the law can be accomplished only by imputing to the driver knowledge of the existence of the sign and full responsibility for failure to stop before entering the arterial."

Flannery v. Tessaromatis, 91 Ohio App. 215, 108 N.

E. 146, states: "* * * that a motorist involved in a collision at an intersection with an automobile approaching from the left on an arterial highway can not be heard to say that he did not know of the existence of the stop sign or that he could not see it; and that a motorist driving on an arterial street has the right to assume that the law will be obeyed and that the motorist approaching the intersection from the cross-street will stop before crossing."

Jones v. McCullough, 148 Kan. 561, 83 P. 2d 669, states: "The defendant insists he was not obliged to stop, because there was no stop sign on the north side of the intersection, and a police ordinance provided that no provision of the stop-sign ordinance should be enforceable against an alleged violator if, at the time and place of the alleged violation, the sign was not in a proper position and sufficiently legible to be seen by an ordinarily observant person. Obviously, such a police ordinance, while it would be effective to relieve the violator from prosecution and fine, could not change the character or nature of streets and thoroughfares which were expressly designated by another ordinance as constituting principal streets and rights of way. Nor could it vitiate still another ordinance which in no way related to the stop-sign ordinance, and which gave plaintiff the right of way where he first entered the intersection or where he and defendant entered it at the same time."

Annotation, 162 A. L. R. 927, contains the following supported by numerous citations: "A motorist proceeding along a favored highway is entitled to assume that traffic on an intersecting secondary highway will yield him the right of way, and the effect of his right to rely on this assumption is not lost because warning signs have been misplaced or removed, or signal lights are not functioning properly. * * * If, of course, a motorist knows of the through character of a highway, the presence or absence of warning signs is immaterial

as respects his negligence in failing to yield a right of way."

In 2 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. Ed.), § 998, p. 242, this language appears: "That the usual marker or sign erected to inform travelers of the superior character of an intersecting road is temporarily removed or destroyed does not change the character of the road nor affect the usual incidents appropriate to such road, such as its conferring the right of way upon traffic flowing along it as against that on intersecting roads * * *. A driver has the right to assume, unless he knew otherwise, that a sign has been erected by the proper authority."

The trial court was correct in concluding that the north-and-south road at the place of the accident was an arterial or favored highway. The jury was, under the circumstances of this case, justified in finding as it did that Crook knew before the accident that the Stone Corner intersection was protected by stop signs and that the north-and-south road was an arterial highway. There is evidence that Crook knew the significance of such a highway, that he knew the purpose and requirements of stop signs erected to protect a favored highway for travelers thereon, and that he knew his duty and responsibility as a motorist traveling on a secondary road approaching and entering its intersection with a favored or arterial highway.

Appellant argues that the contributory negligence of appellee was more than slight as a matter of law and that the motion of appellant for a directed verdict or for judgment notwithstanding the verdict should have been granted by the trial court. This hypothesis assumes that the intersection was not protected by stop signs and that the north-and-south road at the intersection had lost its status as an arterial highway. Appellant then says that the vehicles involved in the collision reached and entered the intersection about the same time, that the automobile of appellant was to the

right of appellee, that it had the directional right-of-way, and that it was in the favored position and entitled to the immediate use of the intersection. The defect in this is that the north-and-south road had not lost its character as an arterial highway at the time of the accident and Crook was not in a favored position as he approached, entered, and traveled in the intersection. The issue of contributory negligence of appellee was in these circumstances one for determination by the jury. In Elliott v. Swift & Co., 151 Neb. 787, 39 N. W. 2d 617, the defendant made the identical argument in this respect as is relied upon by the appellant in this case. The defendant in that case said that its driver in approaching the intersection from the right had the right-of-way, that there was no evidence that the plaintiff entered the intersection first, and that plaintiff was negligent in entering the intersection with knowledge that a truck was approaching and in not watching for it. This court denied the validity of that contention. It said: "The rules in this state are that when a person enters an intersection of two streets or highways he is obligated to look for approaching cars and to see those within that radius which denotes the limit of danger. If he fails to see an automobile not shown to be in a favorable position, the presumption is that its driver will respect his right-of-way and the question of his contributory negligence in proceeding to cross the intersection is a jury question."

Appellant contends that if the doctrine above discussed is applicable and if appellee was in a favored position because he assumed that the road he was on was an arterial highway, nevertheless his conduct was such that he was precluded from any recovery as a matter of law. The basis for this conclusion is the duty imposed by law upon a motorist approaching an intersection even though the motorist is in a favored position. All travelers are required to exercise due care in coming to, entering, and traversing an intersection of

public highways. Bezdek v. Patrick, 167 Neb. 754, 94 N. W. 2d 482; Pankonin v. Borowski, 167 Neb. 382, 93 N. W. 2d 41.

The following from Whitaker v. Keogh, 144 Neb. 790, 14 N. W. 2d 596, is appropriate in considering this contention of appellant: "This court has held that the failure of the driver of an automobile, upon approaching an intersection, to look for vehicles approaching the same intersection, where, by looking, a collision could be avoided, constitutes negligence more than slight as a matter of law and operates to defeat a recovery. * * * But this rule is subject to certain limitations. It was not intended to make a person entering a street intersection an insurer against a collision irrespective of the negligence of the other party. * * * In the instant case the plaintiff approached the intersection from the defendant's right, and, consequently, had the right of way over all cars approaching from the left which had not entered the intersection ahead of her. * * * Plaintiff had the right to assume that the driver of any car approaching the intersection in an unfavored position would take the steps necessary to permit her to clear the intersection. * * * There is no evidence * * * that defendant's car first entered the intersection and thereby became the favored car * * *. The proper rule is that when a person enters an intersection of two streets or highways he is obligated to look for approaching cars and to see those within that radius which denotes the limit of danger. * * * If he fails to see an automobile not shown to be in a favorable position, the presumption is that its driver will respect his right of way and the question of his contributory negligence in proceeding to cross the intersection is a jury question." See, also, Pupkes v. Wilson, 165 Neb. 852, 87 N. W. 2d 556; Maska v. Stoll, 163 Neb. 857, 81 N. W. 2d 571; Griess v. Borchers, 161 Neb. 217, 72 N. W. 2d 820; Becks v. Schuster, 154 Neb. 360, 48 N. W. 2d 67.

The duty of Crook, because of the circumstances

present, was to stop the Buick before he entered the intersection and not to have moved into it until he could have done so without hazard to appellee. § 39-729, R. S. Supp., 1957; § 39-754, R. R. S. 1943; Styskal v. Brickey, 158 Neb. 208, 62 N. W. 2d 854. There is evidence that appellee as he was traveling toward but several miles north of the intersection on the day of the accident had in mind that he had the right-of-way on the road he was using over a traveler entering it from a non-favored road. Appellee had a right to assume that Crook would obey his duty to stop when he came to the intersection and allow appellee to cross it safely until he had warning that Crook would not do so. Thereafter appellee was required to use due care not to injure Crook. Appellee was not required to assume that Crook would do an unlawful or negligent act. Paddack v. Patrick, 163 Neb. 355, 79 N. W. 2d 701; Styskal v. Brickey, *supra.*

Appellant complains that he alleged that appellee did not keep a proper lookout as he came to and entered upon the intersection and that the trial court failed to submit that specification of contributory negligence to the jury. Appellant also asserts that appellee did not look to his right as he came to and entered upon the intersection or he looked and did not see the Buick which was in plain view or he saw it and did nothing to avoid the collision. There is no evidence that appellee did not look to his right or that he did not maintain a lookout for traffic approaching the intersection from the west. The absence of memory prevented him from saying what the facts were in this regard. Crook survived the accident by only a few days and he was not available as a witness. The guest in the Buick with Crook did not notice what appellee was doing as he traveled about the last quarter of a mile before the collision. The guest testified only as to what the truck of appellee was doing while the witness saw it before the collision. There is no presumption that appellee was

negligent. The burden was on appellant to prove the contributory negligence charged by him against appellee, a specification of which was his failure to keep a lookout.

In Spaulding v. Howard, 148 Neb. 496, 27 N. W. 2d 832, this court observed: "It is a question of fact as to the negligence of the parties as to what they did or did not see, or what they should or could have seen."

Bergendahl v. Rabeler, 133 Neb. 699, 276 N. W. 673, states: "The only other allegation of negligence charged against the defendant is that he failed to keep a proper lookout. The record is devoid of any evidence on this subject unless it can be inferred that the happening of the accident is evidence of it. This, of course, is not the case, as negligence must be affirmatively established." The presumption, since there is no evidence to the contrary, is that appellee did have a proper lookout as he came to and entered the intersection.

Price v. King, 161 Neb. 123, 72 N. W. 2d 603, contains the following: "The defendants contend primarily that the evidence shows Nellie Price was guilty of negligence more than slight as a matter of law when compared with the negligence of the defendants. The only negligence shown on the part of Nellie Price was that she was driving fast. * * * Whether she was negligent in failing to keep a proper lookout, or in failing to yield the right-of-way, is dependent upon the facts proved, and consequently is a matter for the jury. The presumption is that she used due care. There is a natural presumption that everyone will act with due care. The mere fact that an accident happens does not prove contributory negligence. Negligence must be proved by direct evidence or by facts from which such negligence can be reasonably inferred. In the absence of such proof, negligence cannot be presumed." See, also, Peake v. Omaha Cold Storage Co., 158 Neb. 676, 64 N. W. 2d 470; Bailey v. Spindler, 161 Neb. 563, 74 N. W. 2d 344; Engel v. Chicago, B. & Q. R. R. Co., 111 Neb. 21, 195 N. W. 523; Chase v. Chicago, B. & Q. Ry.

Co., 91 Neb. 81, 135 N. W. 430; 20 Am. Jur., Evidence, § 217, p. 214. The trial court was correct in its conclusion that appellee was not guilty of contributory negligence as a matter of law and that there was no issue for the jury as to whether or not appellee looked for traffic from the west as he came to and entered the intersection.

The answer of appellant charged that the collision of the vehicles was proximately caused by the negligent acts of appellee as he approached and entered upon the intersection which were in part as follows: Excessive and unlawful rate of speed of more than 60 miles per hour in disregard of the safety and well-being of others upon the highway; the operation of his truck at a speed greater than was reasonable and proper without regard for the traffic and use of the highways and the intersection and especially as they were then being used by Crook; and failure of appellee to reduce the speed of his truck or to stop it before its collision with the Buick operated by Crook when appellee saw or by reasonable care should have seen the Buick coming to and entering upon the intersection.

The trial court undertook to instruct the jury as to the statutes of the state regarding the speed of motor vehicles under varying circumstances and conditions. Appellant contests the correctness of the instruction and asserts that it is defective and prejudicial. Therein it was stated that no person shall drive a vehicle on a highway at a greater speed than is reasonable and prudent under the circumstances then existing and that a speed of 60 miles per hour is prima facie a lawful speed on a highway between the hours of sunrise and sunset. This was followed by the statement: "The fact that the speed of a vehicle is lower than the foregoing prima facie limits shall not relieve the driver from the duty to decrease speed when special hazards exist with respect to other traffic, and speed shall be decreased as may be necessary to avoid colliding with any

person *  *  * on or entering the highway in compliance with the legal requirements, and the duty of all persons to use due care." The language of subsection (4) of section 39-7,108, R. R. S. 1943, is as follows: "The fact that the speed of a vehicle is lower than the foregoing prima facie limits shall not relieve the driver from the duty to decrease speed when approaching and crossing an intersection *  *  * or when special hazards exist with respect to pedestrians or other traffic or by reason of weather or highway conditions, and speed shall be decreased as may be necessary to avoid colliding with any person, vehicle or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care *  *  *." The instruction omitted the limitation and restriction of the statute that the fact that the speed of a vehicle was less than the prima facie limits should not relieve the driver from the duty to decrease speed "when approaching and crossing an intersection." This was an important and material omission in this case. That specific limitation and restriction was involved in the charges of contributory negligence made by appellant against appellee that he operated his truck at an unlawful rate of speed of more than 60 miles per hour in coming to and going upon the intersection, that the speed of appellee was greater than was reasonable and proper under the circumstances then existing, and that appellee failed to use any care to reduce the speed of his truck or to stop it before its collision with the Buick when he saw or should have seen the Buick coming to and entering the intersection. There was evidence tending to prove these charges. The intersection was unobstructed. Appellee could have seen and was charged with the obligation of seeing the Buick when he was as much as a quarter of a mile north and the Buick was about an equal distance west of the intersection. This opportunity and duty continued to the time of the collision. The truck was driven by appellee down the center of the

road at about 55 to 60 miles per hour without decreasing its speed, attempting to stop, or to do anything to avoid or prevent the collision. The speed of appellee, his acts, and omissions, as alleged by appellant and supported by the evidence, were an issue in the case. Any violation of the statute by appellee was a fact to be considered by the jury with all the other evidence in deciding the existence and degree of any contributory negligence of appellee. A correct applicable instruction was mandatory.

The court must without request properly instruct the jury upon each material issue presented by the pleadings and evidence, including the affirmative defense of contributory negligence. Each specific charge of contributory negligence pleaded and supported by proof should be by the instructions submitted to the jury for its determination and a failure to do so is error. Krepcik v. Interstate Transit Lines, 154 Neb. 671, 48 N. W. 2d 839.

The restrictions of subsection (4) of section 39-7,108, R. R. S. 1943, are speed limitations upon the prima facie lawful speeds fixed for any highway outside of a city or village. They impose a duty to decrease speed to less than the prima facie lawful speeds when the conditions described exist. They characterize conditions by virtue of which the prima facie lawful speeds are unsafe and unlawful. Krepcik v. Interstate Transit Lines, *supra*. The material applicable limitations and qualifications upon speed contained in the statute should all be included in an instruction on that subject to enable the jury to know and understand the duty of drivers in approaching and crossing an intersection of highways.

In Harding v. Hoffman, 158 Neb. 86, 62 N. W. 2d 333, it is stated: "In Hamblen v. Steckley, 148 Neb. 283, 27 N. W. 2d 178, this court concluded that a similar instruction, given under circumstances comparable with those at bar, was prejudicially erroneous. Therein it was held: 'An instruction reciting the provisions

of statutes regulating and controlling the speed of motor vehicles should include therein all the material applicable statutory limitations and qualifications to enable the jury to observe and understand the duty of drivers at the time and place in question.' "

In Burhoop v. Brackhan, 164 Neb. 382, 82 N. W. 2d 557, this court said: "An instruction on speed should always contain all material applicable limitations and qualifications thereon as contained in statutes or ordinances as they relate to the factual situation with which the jury is confronted."

In the trial of an action concerning the collision of motor vehicles on an intersection of a favored highway and a nonfavored road which involves issues of negligence and contributory negligence, the jury should be fully and precisely instructed as to the relative and reciprocal rights and duties of the operators of the motor vehicles in approaching and crossing the intersection. Bezdek v. Patrick, *supra*. Appellee when he was coming to and entering the intersection was obligated to decrease the speed of his truck and was required, notwithstanding his favored position, to not only look for an approaching vehicle but to see the automobile which was in plain sight and which was coming from the west to the intersection. Burhoop v. Brackhan, *supra*. The instruction as to speed was erroneous in the respect discussed above and the omission therein was prejudicial to appellant.

The judgment should be and it is reversed and the cause is remanded for further proceedings according to law.

REVERSED AND REMANDED.